UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                       Case No. 8 : 22 - cv - 01725 - TPB - JSS
                                      **FILED UNDER SEAL**

NATHANIEL ESALOMI,

    Defendant.

_____/

## COMPLAINT UNDER THE CONTROLLED SUBSTANCES ACT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES

### INTRODUCTION

1.    The United States of America sues for injunctive relief and civil monetary penalties based on the defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, et seq. (the "CSA") and its implementing regulations, 21 C.F.R. § 1301, et seq.

2.    Opioid abuse is a national public health emergency. The dispensing and distributing of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice, exacerbates this crisis and harms the public health.

3.    The defendant, Nathaniel Esalomi, has both fueled and profited from the opioid epidemic by repeatedly dispensing powerful opioids prone to abuse in violation of the CSA through the guise of Apexx Pharmacy, which he owns and runs

as the sole pharmacist.  In transactions with undercover law enforcement, Esalomi repeatedly filled prescriptions for controlled substances that he knew were not legitimate in exchange for cash.  Esalomi also repeatedly filled prescriptions in the names of dead patients and falsely recorded that these patients were present in the pharmacy when the drugs were dispensed.  In so doing, Esalomi violated the CSA.

4.       Accordingly, the United States seeks to enjoin defendant's unlawful conduct to protect the public health and impose civil monetary penalties for past violations of the CSA.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over the subject matter and all parties to this action pursuant to 21 U.S.C. §§ 842(c)(1)(A) and 882(a), 28 U.S.C. §§ 1331, 1345, 1355, and 1367(a).

6.       This Court has personal jurisdiction over the defendant, and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because the defendant either resides in this district or transacts business in this district.

## PARTIES

7.       The plaintiff is the United States of America.

8.       The defendant, Nathaniel Esalomi, is licensed by the State of Florida as a pharmacist.  At all times relevant to this Complaint, Esalomi owned and operated Apexx Pharmacy, LLC ("Apexx"), which does business as a retail pharmacy, located at 10343 State Road 52, Hudson, Florida 34669.  Esalomi is the sole pharmacist and the pharmacist-in-charge of Apexx.

2

## LEGAL BACKGROUND

**A.    Applicable statutes, regulations, and guidelines**

9.     The CSA and its implementing regulations govern the manufacturing, distributing, and dispensing of controlled substances in the United States. Congress recognized the importance of preventing the diversion of drugs from legitimate medical or scientific uses to any other illegitimate uses. The CSA establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.  21 U.S.C. §§ 841(a), 842(a).

10.     The CSA categorizes controlled substances in five schedules.

11.     Schedule I consists of substances that have "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use under medical supervision."  21 U.S.C. § 812(b)(1); 21 C.F.R. § 1308.11.

12.     Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence" but nonetheless have "a currently accepted medical use in treatment."  21 U.S.C. § 812(b)(2).

13.     Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence."  Schedule III drugs also have "a currently accepted medical use."  21 U.S.C. § 812(b)(3).

14.     Schedule IV contains drugs that, although having a lower abuse

3

potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.  21 U.S.C. § 812(b)(4).

15.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused. 21 U.S.C. § 812(b)(5).

16.     As relevant here, the following substances are controlled substances regulated under the CSA:

      a. Promethazine-Codeine (Schedule V);
      b. Oxycodone (Schedule II);
      c. Hydromorphone (Schedule II);
      d. Suboxone (Schedule III).

17.     The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical. The term "distributor" means a person who so delivers a controlled substance or a listed chemical. 21 U.S.C. § 802(11).

18.     The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user or research subject. 21 U.S.C. § 802(10).

19.     The terms "deliver" or "delivery" mean the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there

4

exists an agency relationship. 21 U.S.C. § 802(8).

20.     The CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.  21 U.S.C. § 822(a).  A registrant is permitted to dispense or distribute controlled substances only "to the extent authorized by their registration and in conformity with the [CSA]."  21 U.S.C. § 822(b).  A pharmacist need not be registered with DEA if the pharmacy which employs the pharmacist is registered with DEA.  21 U.S.C. § 822(c)(1); *see also* 21 C.F.R. § 1306.06.

21.     At all times relevant to this Complaint, Apexx was registered as a retail pharmacy with DEA in Schedule II–V controlled substances under registration number FA54933363.  This DEA registration authorizes Apexx to "dispense" controlled substances.

22.     Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy, are not required to register with DEA, "if such agent or employee is acting in the usual course of his business or employment."  21 U.S.C. § 822(c)(1).

23.     Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.  *See generally* 21 C.F.R. § 1306.

24.     Unless dispensed directly by a practitioner (other than a pharmacist) to an ultimate user, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician. 21 U.S.C. § 829(a). Unless

dispensed directly by a practitioner (other than a pharmacist) to an ultimate user, no

Schedule III or IV controlled substance may be dispensed without a written or oral

prescription from a practitioner. 21 U.S.C. § 829(b).  No controlled substance in

schedule V . . . may be distributed or dispensed other than for a medical purpose. 21

U.S.C. § 829(c).

25.    Such a prescription for a controlled substance may only be issued by an

individual who is (a) "authorized to prescribe controlled substances by the

jurisdiction in which he is licensed to practice his profession" and (b) registered with

the DEA.  21 U.S.C. § 822; 21 C.F.R. § 1306.03.

26.    A prescription for a controlled substance is valid only if issued "for a

legitimate medical purpose by an individual practitioner acting in the usual course of

his professional practice." 21 C.F.R. § 1306.04(a); *United States v. Moore*, 423 U.S.

122, 140-42 (1975); *Ruan v. United States*, 142 S. Ct. 2370, 2382 (2022) (explaining

that this is an objective standard).

27.    "An order purporting to be a prescription issued not in the usual course

of professional treatment . . . is not a prescription within the meaning and intent" of

21 U.S.C. § 829 and "the person knowingly filling such a purported prescription, as

well as the person issuing it, shall be subject to the penalties provided for violations

of the provisions of law relating to controlled substances." *Id.*

28.    "The responsibility for the proper prescribing and dispensing of

controlled substances is upon the prescribing practitioner, but a corresponding

responsibility rests with the pharmacist who fills the prescription."  21 C.F.R

§ 1306.04(a).  Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

29.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy …"  21 C.F.R. § 1306.06.

30.    Under the CSA "It shall be unlawful for any person . . . who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 829 of this title." 21 U.S.C. § 842(a)(1).  Civil penalties may be imposed for the violation of this provision.

31.    Additionally, the CSA prohibits maintaining a drug-involved premises. This means (1) knowingly opening, leasing, renting, using, or maintaining any place for the purpose of distributing a controlled substance or (2) managing or controlling any place and knowingly making that place available for use for the purpose of unlawfully distributing a controlled substance.  21 U.S.C. § 856.

32.    Florida law defines the "Practice of the profession of pharmacy" to include "compounding, dispensing, and consulting concerning contents, therapeutic values, and uses of any medicinal drug; consulting concerning therapeutic values and interactions of patent or proprietary preparations, whether pursuant to prescriptions or in the absence and entirely independent of such prescriptions or orders; and conducting other pharmaceutical services."  Section 465.003(1), Florida Statutes.

33.    Federal law authorizes only a pharmacist acting in the usual course of

professional pharmacy practice to fill a controlled substance prescription. *See* 21

C.F.R § 1306.06. Under Florida Law, only a "pharmacist, in good faith and in the

course of professional practice only, may dispense controlled substances . . . ."

893.04(1)(a). A pharmacy must keep records of the individual pharmacist

responsible for dispensing of each prescription. *See* Fla. Admin. Code 64B16-

28.140(3)(b)(7).

34.     Florida law requires, as a condition of obtaining a pharmacy permit,

that the pharmacy designate a licensed pharmacist as a "prescription department

manager." *See* Section 465.018(2), Florida Statutes. A Prescription Department

Manager, which is also commonly referred to as a pharmacist in charge, must be

identified to the Florida Board of Pharmacy, and no pharmacist may serve as a

prescription department manager at more than one pharmacy. Section

465.022(11)(c), Florida Statutes. The prescription department manager is

"responsible for ensuring [. . .] compliance with all statutes and rules governing the

practice of the profession of pharmacy, including maintenance of all drug records

and ensuring the security of the prescription department, and shall competently and

diligently exercise their responsibilities as a prescription department manager." Fla.

Admin. Code. 64B16-27-450(2).

35.     Florida pharmacy law requires that a pharmacist maintain a patient

record system for all patients which "shall provide for the immediate retrieval of

information necessary for the dispensing pharmacist to identify previously dispensed

drugs at the time a new or refill prescription is presented for dispensing." Fla.

Admin. Code 64B16-27.800. Moreover, the pharmacist must "ensure that a reasonable effort is made to obtain, record and maintain" patient information relevant to pharmacy practice including, "Pharmacist comments relevant to the individual's drug therapy, including any other information peculiar to the specific patient or drug." *Id.*

36.     Under Florida law, the practice of pharmacy requires that a licensed pharmacist conduct a prospective drug utilization review prior to dispensing each new and refill prescription. Fla Admin. Code 64B16-27.810. A pharmacist must review the patient pharmacy record to promote therapeutic appropriateness and identify: (a) Over-utilization or under-utilization; (b) Therapeutic duplication; (c) Drug-disease contraindications; (d) Drug-drug interactions; (e) Incorrect drug dosage or duration of drug treatment; (f) Drug-allergy interactions; (g) Clinical abuse/misuse. A licensed pharmacist must, upon recognizing any of these indications, take appropriate steps to avoid or resolve the potential problems, including consulting with the prescriber, if necessary. *Id.*

37.     The knowing dispensing of controlled substances when deliberately ignoring warning signals that a prescription was not issued for a legitimate purpose by a practitioner acting in the usual course of professional practice violates the prescription requirement contained in 21 U.S.C. § 829, because doing so violates the pharmacist's corresponding responsibility to ensure that a prescription was issued by a practitioner acting in the usual course of medical practice and for a legitimate medical purpose (21 C.F.R. § 1306.04) and because the a controlled substance

prescription may only be filled in the usual course of professional pharmacy practice (21 C.F.R. § 1306.06).

38.     Florida law also states that a pharmacist may not dispense a controlled substance listed in Schedule II, Schedule III, or Schedule IV to any patient without first determining, in the exercise of her or his professional judgment, that the prescription is valid. *See* Section 893.04(2)(a), Florida Statutes. The pharmacist may dispense the controlled substance when the pharmacist or pharmacist's agent has obtained satisfactory patient information from the patient or the patient's agent. *Id.* Florida law requires that pharmacists interpret and act on clinical data, and perform therapeutic interventions when necessary. Section 465.016(t), Florida Statutes.

39.     Pharmacists are therefore permitted to dispense a controlled substance only in accordance with a generally accepted, objective standard of practice (i.e., "the usual course of his professional practice" of pharmacy) and only when a prescription is issued for a legitimate medical purpose. *Id.*

40.     Consequently, a pharmacist violates the CSA by filling a prescription if he or she knows or was willfully blind to the fact that the prescription was not written for a legitimate medical purpose. See 21 C.F.R. §§ 1306.04, 1306.06.

41.     A pharmacist must exercise sound professional judgment in determining the legitimacy of a controlled substance prescription. Fla. Admin. Code § 64B16-27.831. "[W]hen a pharmacist is presented with a prescription for a controlled substance, the pharmacist shall attempt to determine the validity of the prescription and shall attempt to resolve any concerns about the validity of the

10

prescription by exercising his or her independent professional judgment." Fla

Admin. Code § 64B16-27.831(2). Florida law requires all pharmacists to complete

continuing education on detecting illegitimate prescriptions. Fla. Admin. Code

§ 64B16-27.831(6).

42.     Under 21 U.S.C. § 842(a)(1) it is "unlawful for any person who is

subject to the requirements of Part C" of the CSA "to distribute or dispense a

controlled substance in violation of [21 U.S.C. § 829]." Thus, a pharmacist who fills

a prescription in violation of 21 U.S.C. § 829 and 21 C.F.R. § 1306 subjects the

pharmacy who employs him or her to civil penalties under 21 U.S.C. § 842(a)(1).

**B.     Penalties and other remedies**

43.     The penalty for a person who violates 21 U.S.C. § 842(a)(1) is as much

as $67,627 for each violation. *See* 21 U.S.C. § 842(c)(1)(A); 28 C.F.R. § 85.5, Federal

Register Vol. 86, No. 236.

44.     Under 21 U.S.C. § 856(d), the civil penalty for a person who violates 21

U.S.C. § 856(a) is no more than the greater of (1) $379,193 or (2) two times the gross

receipts, either known or estimated, that were derived from each violation that is

attributable to the person. 28 C.F.R. § 85.5, Federal Register Vol. 86, No. 236.

45.     The CSA authorizes federal courts to enjoin violations of the CSA,

including violations of Sections 842(a)(1) and 856. *See* 21 U.S.C. §§ 843(f) and

882(a).

## FACTUAL ALLEGATIONS

46.     On May 11, 2022, law enforcement received a report of potentially

fraudulent prescriptions for promethazine with codeine cough syrup ("promethazine-codeine") being filled at pharmacies in Pinellas, Pasco, and Hillsborough Counties. The individual filling the prescriptions was a known drug trafficker and the purported prescriptions were issued by a Tampa area physician, "Doctor 1."

47.     Oxycodone is a potent opioid in Schedule II and the 30 mg formulation is the highest strength formulation of immediate-release oxycodone, is often diverted, and has a significant street value.

48.     Promethazine-codeine is a Schedule V controlled substance. When prescribed legitimately, the drug is used as an acute cough suppressant. Codeine is an opioid. However, promethazine-codeine is commonly diverted and abused, and is often an item stolen in pharmacy robberies. When used recreationally, it is often mixed with beverages or other drugs. One bottle of promethazine-codeine, which costs relatively little to purchase through a pharmacy,[1] commands several thousand dollars when sold illicitly on the street.

49.     Suboxone is an opioid and a controlled substance in schedule III and is approved to treat the symptoms of opioid withdrawal. Suboxone is, however, prone to abuse and has a retail street value.

50.     In June, 2022, law enforcement was alerted that Doctor 1 writes prescriptions in exchange for cash, charging $450 for an oxycodone prescription and

---

[1] *See* https://www.goodrx.com/promethazine-codeine?form=syrup&dosage=6.25mg-10mg-5ml&quantity=470&label_override=promethazine-codeine.

$650 for a promethazine-codeine prescription. Doctor 1 issues purported prescriptions based on the information provided on a driver's license but without seeing or having a doctor-patient relationship with the person depicted in the license.

51.     Subsequently, in two transactions conducted by law enforcement, Doctor 1 wrote more than a dozen prescriptions for controlled substances to individuals Doctor 1 had never met or examined, based on nothing more than text message containing images of the purported patients' driver's licenses.  Doctor 1 provided these prescriptions in exchange for thousands of dollars in cash.

52.     On July 7, 2022, two undercover law enforcement officers took six of these prescriptions to Apexx to be filled by Esalomi.

53.     The six prescriptions were for identical quantities of oxycodone 30 mg tablets, promethazine-codeine, and suboxone for each of the two undercover law enforcement officers presenting the prescriptions.

54.     Esalomi filled these six prescriptions despite having actual knowledge or being willfully blind to the fact that they were not legitimate.  Esalomi attempted to conceal the illegitimate nature of the prescriptions by creating four non-controlled substance prescriptions, which no doctor had issued, for each undercover law enforcement officer.

55.     To conceal the illegitimate prescriptions among prescriptions for medications subject to less law enforcement scrutiny, Esalomi fraudulently created four additional prescriptions for the non-controlled substances azithromycin, docusate sodium (stool softener), cyclobenzaprine (muscle relaxant) and ibuprofen

for each undercover law enforcement officer.  No doctor issued these prescriptions, nor did the undercover law enforcement officers request them.  However, Esalomi added these to each order as if they were prescriptions issued by Doctor 1.

56.     The exceedingly high price that Esalomi charged for the prescriptions also demonstrates his knowledge that they were not legitimate.  Esalomi charged $650 for each of the two 473 ml bottles of promethazine-codeine, which is far above the market price for this medication when dispensed pursuant to a legitimate medical purpose. A person would only be willing to pay these prices because the promethazine-codeine was not intended for legitimate medical use, such as having an expectation to ultimately sell the controlled substances on the street for a much higher price.

57.     Two different undercover law enforcement officers conducted a second visit to Apexx later in the day on July 7, 2022, seeking to fill other prescriptions written by Doctor 1.

58.     These prescriptions were for two of the same drugs as the prescriptions filled during the first visit:  oxycodone 30 mg tablets and promethazine-codeine.

59.     Esalomi filled these prescriptions despite having actual knowledge or being willfully blind to the fact that they were not legitimate.  When one of the undercover officers, Special Agent Joseph Pelz ("SA Pelz"), provided a driver's license from Massachusetts, Esalomi requested a Florida address.  In the presence of Esalomi, SA Pelz turned to the other undercover officer, Task Force Officer Jason Gates ("TFO Gates"), and asked if he could use the same address shown on TFO

14

Gates's undercover driver's license.  Then, while at the pharmacy counter in front of Esalomi, SA Pelz filled out a patient form using TFO Gates's undercover driver's license address. Esalomi knew that this was a ruse, and stated "because of out-of-state I will have problems."

60.     Esalomi's request for SA Pelz to alter his address was designed to evade law enforcement detection.  Controlled substance prescriptions filled in Florida are required to be reported to the Florida Electronic Online Reporting of Controlled Substances Evaluation, E-FORCSE, a prescription drug monitoring program ("PDMP").  Out of state addresses or customers who travel long distances to obtain controlled substance prescriptions are well-known red flags that a prescription may not be legitimate. PDMP records can be reviewed by law enforcement and Esalomi knew that a PDMP report showing that he had filled commonly diverted, high-potency opioid prescriptions to an out-of-state customer might attract law enforcement scrutiny if discovered.

61.     On the second visit to Apexx conducted by law enforcement, Esalomi again fraudulently created additional prescriptions for the non-controlled substances azithromycin, docusate sodium (stool softener), cyclobenzaprine (muscle relaxant) and ibuprofen for each undercover law enforcement officer.  No doctor issued these prescriptions, nor did the undercover law enforcement officers request them. However, Esalomi added these prescriptions to each order as if they were issued by Doctor 1.

62.     Esalomi again charged the excessive price of $650 for each of the two

473 ml bottles of promethazine-codeine. Esalomi charged this amount because he knew the controlled substance prescriptions were illegitimate and that a person paying these higher prices was willing to do so because the promethazine-codeine was not intended for legitimate medical use, such as having an expectation to ultimately sell the controlled substances on the street for a much higher price.

63.    Moreover, when TFO Gates removed a stack of cash from his pocket and informed Esalomi he only had $1,650 rather than the total charge of $1,816 for the four prescriptions and the four non-controlled medications, Esalomi accepted the $1,650, stating "when you come back next time you pay me...can I trust you."

64.    A week later on July 14, 2022, SA Pelz and TFO Gates returned to Apexx, and paid Esalomi $180 for the prior transaction, which Esalomi accepted. SA Pelz and TFO Gates then gave Esalomi eight prescriptions written by Doctor 1 – four for promethazine-codeine and four for oxycodone – issued to patients who were not present in the pharmacy.  None of these prescriptions were for SA Pelz's or TFO Gates's undercover identities. Esalomi agreed to fill the prescriptions, so SA Pelz then gave Esalomi four driver's licenses corresponding with the identities of the prescriptions. Esalomi instructed SA Pelz to fill out patient forms for the prescriptions.  Esalomi instructed SA Pelz to forge the signature for each of the four purported patients on the forms.

65.    SA Pelz and TFO Gates left Apexx and returned later that day to pick up the prescriptions. Esalomi informed them that because the patients did not have a history of filling prescriptions for controlled substances in the Florida prescription

16

data monitoring program (PDMP), Esalomi would need to see the patients in the pharmacy.  SA Pelz and TFO Gates stated that they would return the next day with the patients.

66.     On July 15, SA Pelz and TFO Gates returned to Apexx with additional undercover officers associated with the undercover drivers' licenses that had been provided to Esalomi the previous day. Each undercover officer filled out a new patient form. Addressing the group, Esalomi stated that the undercover officer with a Miami address needed use a local address, because "Miami is just too far for me." In the presence of Esalomi, TFO Gates told the undercover officer with the Miami address to just use the address on TFO Gates's undercover license. Esalomi approved this change.

67.     Esalomi also stated that he needed telephone numbers from everyone and indicated that it would be acceptable for everyone in the group to use TFO Gates's phone number.

68.     The group of undercover officers left the pharmacy, and SA Pelz and TFO Gates returned approximately one hour later, without the other undercover officers. Esalomi told SA Pelz that the prescriptions would cost $3,632.  SA Pelz paid Esalomi $3,640, and Esalomi then provided two bags to TFO Gates.

69.     The bags contained four bottles of oxycodone pills, four 473 ml bottles of promethazine-codeine, and four bottles of each of the non-controlled substance medications.  Again, Esalomi had fraudulently created prescriptions for these medications as though they had been prescribed by Doctor 1, even though they were

17

not, and had not been requested.

70.     As with the other transactions, Esalomi knew that the prescriptions filled on July 15, 2022 were not legitimate.  Esalomi requested the alteration of the Miami address to avoid detection by law enforcement through the PDMP because a person traveling a long distance to fill a prescription is a well-known red flag that a prescription may not be legitimate. Esalomi knew that a PDMP report showing he had filled commonly diverted, high-potency opioid prescriptions to a south Florida customer would attract law enforcement scrutiny if discovered.

71.     Likewise, Esalomi added the non-controlled substance prescriptions to conceal the illegitimate controlled substance prescriptions among prescriptions for medications subject to less law enforcement scrutiny.

72.     Falsely adding non-controlled medications for customers who wish to fill only controlled substance prescriptions also allowed Esalomi to maintain a false ratio of controlled to non-controlled substances, which is a metric that is often examined by pharmacy distributors.

73.     Esalomi charged the excessive price of $650 for each of the four 473 ml bottles of promethazine-codeine, which is far above the market price for this medication when dispensed pursuant to a legitimate medical purpose.  Esalomi charged this amount because he knew the controlled substance prescriptions were illegitimate and that a person paying these higher prices was willing to do so because the promethazine-codeine was not intended for legitimate medical use, such as having an expectation to ultimately sell the controlled substances on the street for a

much higher price.

74.     The exchanges of illegitimate prescriptions for cash described in the preceding paragraphs were essentially drug deals, in violation of 21 U.S.C. § 842(a)(1).

75.     In addition to the drug deals described above, Esalomi has separately filled prescriptions for controlled substances for at least three patients (Patient 1, Patient 2, and Patient 3) who were deceased at the time that the prescriptions were filled, in violation of 21 U.S.C. § 842(a)(1).

76.     Patient 1 died on June 21, 2019, but between July 19, 2021 and July 21, 2022, Esalomi filled at least twenty-three prescriptions for hydromorphone, twenty prescriptions for oxycodone, two prescriptions for alprazolam, and one prescription for promethazine with codeine syrup for Patient 1.  Each time he filled the prescriptions, Esalomi falsely indicated that Patient 1 came to the pharmacy in person.

77.     Patient 2 died on June 16, 2021, but Esalomi filled prescriptions for hydromorphone for Patient 2 on July 29, 2021 and October 8, 2021.  Each time he filled the prescriptions, Esalomi falsely indicated that Patient 2 came to the pharmacy in person.

78.     Patient 3 died on October 19, 2018, but Esalomi filled at least twenty prescriptions for hydromorphone, thirteen prescriptions for oxycodone, and one prescription for promethazine-codeine for Patient 3 between July 1, 2021 and July 21, 2022.  Each time he filled the prescriptions, Esalomi falsely indicated that Patient

19

3 came to the pharmacy in person.

79.     Esalomi knew or was willfully blind to the fact that these prescriptions were illegitimate, and sought to conceal his conduct by falsely recording that these persons, who were deceased, came into the pharmacy in person to fill these prescriptions.

80.     Based on PDMP records, the United States alleges that Esalomi has filled many more prescriptions for oxycodone, promethazine-codeine, and other powerful controlled substances in violation of the CSA.

<u>COUNT I</u>

**Controlled Substances Act**
**21 U.S.C. § 842(a)(1)**
**Civil Penalty Liability**

81.     The United States re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

82.     Title 21, U.S.C. § 842(a)(1) makes it unlawful for any person subject to Part C of the CSA to distribute or dispense a controlled substance in violation of 21 U.S.C. § 829.  As an owner-pharmacist of a registrant dispensing controlled substances, the defendant is subject to Part C of the CSA.

83.     Defendant Nathaniel Esalomi violated 21 U.S.C. § 829 by filling prescriptions for controlled substances outside the usual course of pharmacy practice in violation of 21 C.F.R. 1306.06, and in violation of his "corresponding responsibility" by knowingly dispensing controlled substances pursuant to

prescriptions that were issued outside the usual course of professional practice or not for a legitimate medical purpose in violation of 21 C.F.R. § 1306.04.

84.     The defendant Nathaniel Esalomi is liable to the United States for a civil penalty of not more than $67,627 for each violation pursuant to 21 U.S.C. § 842(c)(1)(A) and 28 C.F.R. § 85.5.

## COUNT II

**Controlled Substances Act**
**21 U.S.C. § 843(f)(1) and 882(a)**
**Permanent Injunctive Relief**

85.     The United States re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

86.     Under 21 U.S.C. § 843(f), the Attorney General of the United States may seek declaratory or injunctive relief for violations of 21 U.S.C. § 842 and 21 U.S.C. § 856.  More broadly, 21 U.S.C. § 882(a) provides for any violation of the CSA to be enjoined.

87.     Based on the violations alleged in this complaint, the United States requests a temporary, preliminary, and permanent injunction (i) prohibiting the defendant from dispensing, administering, or distributing any controlled substance, as those terms are defined in the Controlled Substances Act, 21 U.S.C. § 802, either directly or through anyone else; (ii) prohibiting the defendant from serving as a manager, owner, operator, or pharmacist-in-charge of any entity, including a pharmacy, that administers, dispenses, or distributes controlled substances; (iii) prohibiting the defendant from applying for or seeking renewal of any DEA

Certificate of Registration on his behalf or on behalf of any corporate entity; and (iv) any other injunctive relief the Court deems appropriate and just.

## COUNT III

**Controlled Substances Act**
**21 U.S.C. § 856**
**Civil Penalty Liability and Permanent Injunctive Relief**

5.       The United States re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

6.       Defendant Nathaniel Esalomi knowingly used, managed, or controlled 10343 State Road 52, Hudson, Florida 34669 for the purpose of operating Apexx Pharmacy to unlawfully distribute controlled substances.

7.       As a result, Defendant is liable to the United States under 21 U.S.C. § 856 for not more than the greater of (1) $379,193 or (2) two times the gross receipts, either known or estimated, that were derived from each violation that is attributable to him for violations occurring on or after June 19, 2020.[2]

**8.**       Additionally, Defendant is subject to an injunction to restrain further violations of Section 856 under 21 U.S.C. § 843(f).

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that judgment be entered in its favor and against the defendant as follows:

_____
[2] This penalty amount has been adjusted pursuant to 28 C.F.R. § 85.5.

22

1.      Impose civil penalties up to the maximum amount allowed by law for each violation of 21 U.S.C. § 842(a)(1) committed by the defendant;

2.      Impose civil penalties up to the maximum amount allowed by law for each violation of 21 U.S.C. § 856(a) committed by the defendant;

3.      Enter a preliminary and permanent injunction to prevent future violations, as described above;

4.      Award the costs associated with the investigation, prosecution, and collection of the penalties and other relief in this matter; and

5.      Award any other relief deemed just by the Court.

Respectfully submitted on this 1st day of August, 2022,

ROGER HANDBERG
United States Attorney

/s/Carolyn B. Tapie
CAROLYN B. TAPIE
Assistant United States Attorney
USA No. 190
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Telephone No. (813) 274-6380
Facsimile No. (813) 274-6200
Carolyn.B.Tapie@usdoj.gov